UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/14/19

------------------------------------------------------------X
:
LUIS MARTINEZ,                                              :
:
                                Petitioner,                :
        -against-                                          :
:
KEVIN K. MCALEENAN, Acting Secretary,                      :        19-cv-2627 (NSR)
U.S. Department of Homeland Security (DHS);                :        ORDER & OPINION
THOMAS DECKER, New York Field Office                       :
Director, US Customs and Immigration                       :
Enforcement; RONALD D. VITIELLO, Deputy                    :
Director of U.S. Immigration and Customs                   :
Enforcement; WILLIAM P. BARR, Attorney                     :
General; WARDEN, Orange County;                            :
Correctional Center,                                       :
                                Defendants,                :
:
------------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge

        Luis Martinez ("Petitioner"), a native and citizen of Mexico, has been living in the U.S.

since 1990, when he was 12 or 13 years old. Petitioner has been detained in U.S. Immigration and

Customs Enforcement ("ICE") custody since January 16, 2019, allegedly pursuant to a reinstated

order of removal. (*See* Petitioner's Letter dated 5/14/19, ECF No. 20.) Petitioner is detained in

Essex County Correctional Facility, where he is in conditions identical to those of county jail

inmates serving criminal sentences. (*See* Letter dated 6/12/19, ECF No. 36.) On March 24, 2019,

Petitioner filed a writ of *habeas corpus* with this Court, arguing that he was never served with any

reinstatement order when he was detained, and nor was his attorney, who for months repeatedly

sought the alleged order justifying Mr. Martinez's detention. (ECF No. 1.)

1

Petitioner filed a First Amended Petition for his writ on April 21, 2019. (ECF No. 7.) Subsequently, on May 13, 2019, Petitioner filed an Order to Show Cause for his immediate release from custody on grounds that he and his counsel had still not received any notice or orders justifying his detention, and hence the detention was unconstitutional. (ECF No. 18.) On May 13, 2019, the day Petitioner filed his Order to Show Cause in this Court, ICE finally served him and his counsel with a Notice of Intent/ Decision to Reinstate the Prior Order (Form I-871). (*See* Letter, ECF No. 20.) Having finally received written notice, Petitioner did not receive a new bond hearing.

On May 28, 2019, I held a Show Cause Hearing to assess the legal basis and constitutionality of Petitioner's Detention. (*See* Docket Entry Dated 5/28/2019.) Following that hearing, I requested that the parties provide additional briefing regarding Petitioner's writ of *habeas corpus* in light of the fact that a belated Notice of Reinstatement Order had finally been served on Petitioner, four months after his initial ICE Detention. (*See id*.) Both parties timely filed their briefs. Presently before the Court is Petitioner's Petition for a Writ of *Habeas Corpus*. (ECF No. 7.) For the following reasons, Petitioner's Writ is GRANTED.

## BACKGROUND

The following facts are taken from the Petitioner's Petition for the Writ of *habeas corpus* and have largely not been disputed by the Government. While they are useful context, they are not the factual or legal basis, for the Court's ensuing decision.

Petitioner Luis Martinez is a citizen of Mexico who has been living in New Paltz, New York since 1990, when he was twelve years old. His father was murdered in Mexico when he was an infant, after which his mother came to the United States to work and support him and his siblings. Petitioner is married. His three children, mother, and two brothers are all U.S. citizens.

Along with his brother, Petitioner owns a well-known and successful construction company, which has projects throughout New Paltz and the Hudson Valley. The company provides work for hundreds of employees. Petitioner's other brother, Jesus Jose Martinez, was shot to death in New Paltz in 1999, while Petitioner was standing beside him, a murder that was never solved.

In September 2016, Petitioner filed an application with United States Citizenship and Immigrations Services ("USCIS") for a "U" visa, a form of legal status for victims of crimes. If approved, this will grant Petitioner legal residence in the United States, despite his prior immigration violations. Although this application is pending, Defendants apprehended Petitioner at his business in January 2019, detained him, threatened to deport him to Mexico, and claimed to be reinstating or have reinstated a prior removal order from more than 20 years ago. Yet, Petitioner claims, Defendants never provided him or his attorney with this supposedly reinstated order.

After being apprehended, Petitioner immediately applied for a stay of deportation based on the pending U visa, as he met the criteria for a stay. ICE denied the stay, but on grounds that are legally questionable for individuals with pending U visa petitions. Meanwhile, USCIS asked Petitioner to submit additional evidence in support of his U visa application.

In fear for his life after ICE denied his stay of removal and threatened to deport him, Petitioner asserted a claim for fear of persecution and torture in Mexico, a right afforded to people whom ICE claims are subject to reinstated orders of removal. This fear stemmed from threats against him relating to his father's murder, and his fear of retaliation based on information he had provided to the U.S. Government about a Mexican drug cartel. An asylum officer then interviewed Petitioner, found his fear credible, and yet denied the application for a stay. Afterwards, an

immigration judge reversed the asylum officer's decision, thereby staying Petitioner's application.

Presently, if Petitioner's application for a U visa is approved, he will be eligible for "deferred action," a form of temporary legal immigration status, while he waits the additional years it typically takes for an actual visa to become available. If a U visa is granted, Petitioner will be eligible to apply for permanent residence (a green card) after about three more years. But if he is deported to Mexico before his U visa application is decided, Petitioner will not be eligible for "deferred action" and could spend several years in Mexico waiting for a U visa to become available. There is a legitimate risk of persecution if Petitioner is deported to Mexico, and there will be additional barriers to admissibility to the U.S. if he is deported—many of which he may not be able to overcome—even if his U visa is eventually approved.

That is Petitioner's immigration history and status. It provides useful context for his current predicament, though only collaterally relates to the instant issue, which is the constitutionality of his detention, and the Court's ability to release him through the writ of *habeas corpus*.

## LEGAL STANDARDS

### I. The Writ of *Habeas Corpus* Generally

"The writ of *habeas corpus* has played a great role in the history of human freedom" because "[i]t has been the judicial method of lifting undue restrains upon personal liberty." *Price v. Johnson*, 334 U.S. 266, 285 (1948). Its origins predate the U.S. Constitution, and can be traced back to the Magna Carta and even the Roman Empire. *See* Magna Carta, Art. 39 ("No free man is to be arrested, or imprisoned, or disseised, or outlawed, or exiled, or in any other way ruined, nor will we go against him or send against him, except by the lawful judgment of his peers or by the law of the land."); *see also* Glass, Albert S, *Historical Aspects of Habeas Corpus*, St. John's Law

Review: Vol. 9: No. 1, Article 3 (1934) (explaining that the writ of *habeas corpus* is similar to the Praetorian Interdict of the Roman Civil Law "*de homine libero exhibendo*," through which if the praetor found that a freeman was restrained of his liberty contrary to good faith, he would order that man to be liberated). It is "at its core a remedy for unlawful executive detention." *Hamdi v. Rumsfeld,* 542 U.S. 507, 536, 124 S.Ct. 2633 (2009). The typical remedy [for such detention] is of course, release." *Munaf v. Green*, 128 S.Ct. 2207, 2221 (2008).

Due to its talismanic significance in protecting individual liberty from unlawful detention, *habeas corpus* is fundamentally governed by equity. *Id*. The Supreme Court has granted the writ when justice has so required. *Carafas v. LaVallee*, 391 U.S. 234, 88 S. Ct. 1556 (1968) (granting the writ even after inmate had completed incarceration and been released in order to prevent him from suffering collateral consequences of the petition being denied). And it has forgone its *habeas* release power when the nature of its relief would be inequitable and inappropriate. *Munaf v. Geren*, 553 U.S. 674, 128 S.Ct. 2207 (denying writ to shelter American citizens held captive in Iraq, where issuing writ would interfere with: Iraq's authority "to punish offenses against its laws committed within its borders" and U.S. Executive Branch's authority to handle sensitive military conduct on foreign territory during "ongoing hostilities") (citation omitted).

Again, the writ derives from broad equitable principles which, while aimed at securing release, provide courts with flexibility to use other forms of relief as justice requires. *Carafas*, 391 U.S. at 238-39. ("the statute does not limit the relief that may be granted to discharge of the applicant from physical custody. Its mandate is broad with respect to relief that may be granted."); *Munaf*, 553 U.S. at 694 (recognizing that writ was not invoked to seek classic "release" from detention by Multi-National Force- Iraq, but rather to procure an equitable "order requiring the

United States to shelter them from the [Iraqi] government"); *Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773 (1946) ("where federally protected rights [are threatened], it has been the position from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief").

## II.  Statutory Framework for District Court's to Issue Writs of *Habeas Corpus*

The writ of *habeas corpus* is so foundational to our legal framework that the Constitution provides: "[t]he privilege of the writ of habeas corpus shall not be suspended unless when in cases of rebellion or invasion the public safety may require it." This language, along with the Judiciary Act of 1789, establishes the authority for at least the Supreme Court to issue writs of *habeas corpus* when they believe a detention is unlawful. *See Ex parte Yerger*, 75 U.S. 85, 86 (1868):

> In all cases where a Circuit Court of the United States has…caused a prisoner to be brought before it, and has, after inquiring into the cause of detention, remanded him to the custody from which he was taken, this court, in the exercise of its appellate jurisdiction, may, by the writ of *habeas corpus*, aided by the writ of *certiorari*, revise the decision of the Circuit Court, and if it be found unwarranted by law, relieve the prisoner from the unlawful restraint to which he has been remanded.

The same authority vested to the Supreme Court above has been extended by Congress to the district courts through the Habeas Corpus Act of 1867, which provides that a district court can grant the writ of *habeas corpus* whenever a petitioner is "in custody in violation of the Constitution or law and treaties of the United States." 28 U.S.C. Section 2241.

Specifically, Section 2241 provides:

> (a)  Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions.
>
> ….
>
> (b)  The writ of habeas corpus shall not extend to a prisoner unless—
>
> > (1)  He is in custody under or by color of the authority of the United States or

> is committed for trial before some court thereof; or
>
> (2) He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or
>
> (3) He is in custody in violation of the Constitution or laws or treaties of the United States…

Further, Section 2243 provides:

> A court, justice, or judge entertaining an application for a writ of habeas corpus shall forthwith award the writ or issue an order directing the responded to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto.
>
> The writ, or order to show cause shall be directed to the person having custody of the person having custody of the person detained. It shall be returned within three days unless for good cause additional time, not exceeding twenty days, is allowed.
>
> The person whom the writ or order is directed shall make a return certifying the true cause of detention.
>
> When the writ or order is returned a day shall be set for hearing, not more than five days after the return unless for good cause additional time is allowed.
>
> Unless the application for the writ and the return present only issues of law the person to whom the writ is directed shall be required to produce at the hearing the body of the person detained.
>
> …
>
> The court shall summarily hear and determine the facts, and dispose of the matter as law and justice require.

## III.    Due Process Under the Fifth Amendment

The Due Process Clause of the Fifth Amendment provides that "[n]o person… shall be deprived of life, liberty, or property without due process of law…." It protects individuals against two types of government action. "Substantive Due Process" prevents the government from engaging in conduct that "shocks the conscience," *Rochin v. California*, 342 U.S. 165, 172, 72

S.Ct. 205, 209 (1952), or interferes with rights "[i]mplicit in the concept of ordered liberty." *Palko v. State of Connecticut*, 302 U.S. 319, 324, 58 S. Ct. 149, 151 (1937). "Procedural Due Process" ensures that government cannot unfairly and without meaningful process deprive a person of life, liberty, or property. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893 (1976).

### a. Procedural Due Process Extends to Aliens in this Country

 "It is now well-established that aliens within this country who face the risk of expulsion are entitled to the procedural safeguards of due process." *Zadvydas v. Caplinger*, 986 F. Supp. 1011 (E.D. La. 1997) ("*Zadvyas I*"). The Supreme Court has articulated that "once an alien gains admission to a country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly." *Landon v. Plasencia,* 459 U.S. 21, 32-33, 103 S.Ct. 321, 329 (1982). It has also frequently held that "a continuously present alien is entitled to a fair hearing when threatened with deportation and has developed the rule that a continuously present permanent resident alien has a right to due process in such a situation." *Id*.

What procedures suffice under the Fifth Amendment requires considering: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of that interest through the procedures used; and (3) the government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail. 424 U.S. 319.

### b. Substantive Due Process Extends to Aliens in this Country

The Due Process Clause of the Fifth Amendment also protects the substantive right to be free from unjustified deprivations of liberty. *Zadvydas v. Davis*, 533 U.S. 678, 690 121 S. Ct. 2491 (2001) ("*Zadvyas II*"). Again, the Supreme Court has held that once aliens develop ties that go with permanent residence, "government detention violates the [Due Process Clause] unless the

detention is ordered in a *criminal* proceeding with adequate procedural protections, or, in certain special and 'narrow' nonpunitive 'circumstances,' where a special justification, such as harm-threatening mental illness, outweighs the 'individual's constitutionally protected interest in avoiding physical restraint." *Id.* (citing *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095 (1987); *Foucha*, 504 U.S. at 80; *Kansas v. Hendricks*, 521 U.S. 346, 356, 117 S.Ct. 2072 (1997) (emphasis in original); *see also Lopez v. Sessions*, No. 18 CIV. 4189 (RWS), 2018 WL 2932726, at *12 (S.D.N.Y. June 12, 2018) (finding that detention of alien for 200 days without procedural due process infringed his right to substantive due process).

In sum, the Fifth Amendment's Due Process Clause forbids the Government to deprive aliens, who have sufficient ties that go with permanent residence, of substantial liberty, particularly without procedural safeguards. It is akin to how citizens cannot be arbitrarily detained without robust mechanistic safeguards, such as those connected with criminal trials and convictions. *Zadvyas II*, 533 U.S. at 690. (The "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects") (citing *Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S.Ct. 1780 (1992)) (internal marks omitted).

## IV.    Notice Requirements Under the Fifth Amendment

Another key element of due process is notice of proceedings. As the Supreme Court has stated, the due process right to be heard "has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950), *see also Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 14 (1978) ("The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending

'hearing.'"). Logically, without service, the person cannot have notice, and without notice, Plaintiff cannot assert any challenge either to the reinstatement notice or procedure itself, or to the underlying order. *Lopez v. Sessions*, 2018 WL 2932726, at *12 ("The "essence" of procedural due process is that a person risking a serious loss be given notice and an opportunity to be heard in a meaningful manner at a meaningful time.")

## V.    Notice Requirements Under Agency Guidelines

The Department of Homeland Security's ("DHS") internal notice requirements are equally, if not more, robust than under the Due Process Clause of the Fifth Amendment. DHS regulations mandate that "in *any* proceeding which is initiated by [DHS], with proposed *adverse effect*, service of the initiating notice of any decision … *shall* be accomplished by personal service." 8 C.F.R. Section 103.8(c)(1) (emphasis added). The regulations also mandate service of such paper on counsel for a person who is represented. 8 C.F.R. Section 292.5(a).

Further, the regulations governing reinstatement of removal orders also mandate that in reinstating an order of removal, the deportation officer "*shall* provide the alien with a written notice of his or her determination" and "*shall* advice the alien that he or she may make a written or oral statement contesting the determination." 8 C.F.R. Section 241.8(b) (emphases added).

ICE's  internal instructions on issuing reinstated orders of removal also provide, *inter alia*, "we *must provide written notice* of this determination" (*see* ICE Manual on Alternative Orders of Removal, December 2008 ("ICE Orders of Removal Manual"), ECF No. 29-4, at 10-11) (emphasis added), "[s]erve the top portion of the notice of intent/decision to reinstate prior order (I-871)" and "*must* also serve the alien with a notice of penalties and form I-294. (*id*. at 11) (emphasis added). The Introduction to the ICE Orders of Removal Manual also provides that in all cases "[t]he aliens

*must* be served with appropriate charging documents" and "allowed the opportunity to rebut the charges." (*Id.* at 3) (emphasis added).

Lastly, the Reinstatement of Removal sub-chapter of the Detention and Removal Operations Policy and Procedure Manual ("DROPPM") also addresses the procedure for issuing reinstatement orders, and expressly instructs that a DHS officer take a sworn statement from the subject of the reinstatement, "complete[ ] and sign[ ] the top portion [of Form I-871], provide[ ] a copy to the alien and retain[ ] a copy for the file," "ask the alien if he or she has any evidence to present to rebut the determination that alien illegally reentered the United States after deportation or removal," and that "[t]he alien has the right to review the evidence that the officer intends to rely on in making the final determination." (Pet. Mot., Exhibit A, ECF No. 35-1, at 3.)

## VI.    New Reinstatement Provision of Immigration and Nationality Act

The reinstatement provision of the Immigration and Nationality Act ("INA") was enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act, Pub L. No. 104-208, div. C, 110 Stat. 3009 ("IIRIRA"). The provision, 8 U.S.C. Section 1231(a)(5), provides:

> If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.

The provision does not codify a step-by-step procedure for reinstating a removal order. *See id.* The Second Circuit has held, however, that the Attorney General may implement the INA's reinstatement provision pursuant to the implementing regulations articulated in 8 C.F.R. Section 241.8. *Garcia-Villeda v. Mukasey*, 531 F.3d 141, 149 (2d Cir. 2008); 8 C.F.R. Section 241.8(b)

11

(reiterating, again, that the immigration officer "*shall* provide the alien with a written notice of his or her determination" and "*shall* advice the alien that he or she may make a written or oral statement contesting the determination.") (emphases added).

Importantly, while *Garcia-Villeda* held that it was constitutional for Congress to due away with the hearing requirement that had previously been part of the reinstatement of removal process, it did not hold that it was Constitutional for Congress to do away with all notice requirements. The Second Circuit's reasoning, in fact, suggested the very opposite. *See id.* at 149 ("We note, however, that despite the lack of a formal hearing, the fast-track reinstatement process under C.F.R. § 241.8 is not devoid of procedural safeguards.") (listing out Section 241.8's procedural safeguards).

## DISCUSSION

### I. The Court has Proper Subject Matter Jurisdiction to Adjudicate this Issue

To begin, neither party disputes that the Court is exercising appropriate subject matter jurisdiction over the instant issue, pursuant to its powers under the Habeas Corpus Act. (*See* Government's Brief Opposing Writ of Habeas Corpus ("Gov. Mem."), ECF No. 33, at 2) ("Whether or not Mr. Martinez's detention – almost four months now – is lawful is a question over which this Court undoubtedly has jurisdiction. *See* 28 U.S.C. § 2241 (authorizing district court to grant writ of *habeas corpus* whenever a petition is 'in custody in violation of the Constitution or law or treaties of the United States.'"); Petitioner's Supplemental Memorandum in Further Support of Plaintiff's Order to Show Cause, ("Pet. Mem."), ECF No. 35, at 2.)).

The Court agrees with the parties and need not belabor the point. Its jurisdiction to adjudicate this issue and issue a writ of *habeas corpus*, if appropriate, is established. *Lopez v.*, 2018 WL 2932726, at *6 ("Federal courts have jurisdiction to hear habeas corpus claims by non-

citizens challenging the constitutionality of their detention.") (citing *Demore v. Kim*, 538 U.S. 510, 516-17 (2003); *Chen v. United States Dep't of Justice*, 434 F.3d 144, 153 n.5 (2d Cir. 2006)).

## II. Petitioner's Initial Detention Was Unconstitutional

The Court ultimately needs to answer the question of whether there is an appropriate basis for it to issue the *habeas corpus* writ. It can find an appropriate basis one of two ways. It can find that Petitioner's initial detention was unconstitutional, and regardless of his present custody, the appropriate remedy for that initial violation alone is to release him. Or it can find that Petitioner's original *and* current detention are unconstitutional, and the appropriate remedy for the continuous violation is to release him.

Petitioner's argument is that *habeas* release is appropriate to remedy just his initial unlawful detention; and, in any event, his current detention is unconstitutional because it was unconstitutional at the time that he was taken into custody, and it cannot be rectified by the Government's last-minute production of a reinstatement order. (*See* Pet. Mem. at 2) ("The question is on a habeas petition is whether the detention was lawful at the time the petition was filed, and not whether Defendants have belatedly 'fixed' it *post hoc*, as they claim to have done here.").

Defendants, on the other hand, argue that Petitioner's present detention is fully authorized by the May 13, Notice of Intent/Decision to Reinstate Prior Order (I-871) ("NOIDTR"), which ICE allegedly served on Petitioner on May 13, 2019. (Def. Mem. at 4-8.) As such, they argue, regardless of the legality of Plaintiff's previous four months of detention, Petitioner's current detention is a separate event, authorized by virtue of a single purportedly corrective document, and therefore Petitioner has no basis to invoke his petition for release.

13

To address the constitutionality of Petitioner's current detention, the Court need first addresses the constitutionality of Petitioner's initial detention.

### a. Petitioner's Initial Detention Lacked Written Notice and Service

The Government argues that there was never a time when Petitioner was unlawfully detained. (*See* Gov. Mem. at 3) ("assuming…that there was such a period of unauthorized detention, which there was not.") Indeed, it argues, as it did at the Show Cause Hearing, that a valid Notice of Reinstatement ("NOIDTR") was issued and served on Petitioner on January 16, 2019, when he was first detained. The Government adds that even if a valid NOIDTR was not issued and served, Petitioner knew he was an alien against whom an order of removal had once been issued, and he therefore had constructive notice of the basis for his detention. (*Id*. at 8-9.)

Petitioner paints a vastly different picture of both the law and facts. He argues that the Government failed to serve him and his counsel with any, let alone a proper, NOIDTR in January— and that the Government continued to thwart its notice obligations, by never providing any, let alone a valid, NOIDTR until May 13, 2019. (Pet. Mem. at 3.)

The Court agrees with Petitioner. Based on the arguments and statements made at the Show Cause Hearing and the exhibits submitted, the Court is unable to find one iota of proof that the Government actually served Petitioner with any NOIDTR, let alone a facially sufficient one, when it detained him.

To begin, both Petitioner and his counsel's affidavits state that Petitioner was taken custody without being served with an arrest warrant or any paper documentary order. (*See* Dec. of Luis Martinez, ECF No. 29-1):

2. On January 16, 2019, I was detained by officers from ICE, in the carpark outside my office in New Paltz. They asked me if I was Luis Martinez, and I replied that I was, and then they told me that they were taking [me] into custody because I had a deportation order. I asked them if they had a warrant for my arrest, and they told me that they would show to me later, and that first they wanted to put me safely in their car. I complied with their request and got into the car.

3. I was then taken to what I presume was an ICE office, while the officers who entertained me did some work on the computer, and told me that I was under arrest. They never asked me if I had [ ] made a false claim to US citizenship in 1993, if I had entered the country illegally after having been deported, or if I had any fears of being returned to Mexico. I was never served with any papers or documents by these ICE officers other than a document with instructions for location of detainees in ICE custody, along with a list of free lawyers.

Petitioner's counsel, Cheryl R. David, provided an affidavit reflecting the same:

2. After Plaintiff was detained, in January 16, 2019, ICE informed both myself and Mr. Martinez that his arrest was based on reinstatement of a prior order of removal. However, no such order of reinstatement was ever served on Mr. Martinez, either in January 2016 or at any time prior or subsequent.

3. At various points subsequent to Plaintiff's detention, I asked his deportation officer to provide me with a copy of any reinstated order of removal. I only got one response to these requests, which was that the officer didn't have it because it was with Mr. Martinez's U visa application in Vermont. This made no sense to me, because there would have been no reason for ICE to have sent a reinstatement order to the USCIS office in Vermont dealing with Mr. Martinez's U visa application.

4. On April 4, 2019, I wrote to Plaintiff's deportation officer and made a formal demand for the order of reinstatement, and any related/supporting documents. I received no response.

6. I was not served with the May 2019 order of reinstatement. I have spoken with my client repeatedly about this, and he told me that although he was shown a document purporting to be a notice of reinstatement in May 2019, he was never actually served with it, and is not in possession of it.

(Declaration of Cheryl R. David, ECF No. 29-2.; *see also*, Letter from Cheryl R. David to ICE Officer Sean Hunter Dated April 4, 2019 (reflecting that as of April 4, Petitioner's counsel was still seeking documents justifying basis for Petitioner's detention.))

At the Show Cause Hearing, the Government did not dispute the possibility that Petitioner was not served with a valid reinstatement order, nor did it offer any proof that the reinstatement order it completed in January was actually served on Petitioner or his counsel.

The Hearing revealed that counsel for the Government was not present during Petitioner's arrest, nor when ICE officers produced and served the supposedly legitimate NOIDTR. In addition, the only affidavit the Government submitted was prepared by Deportation Officer Timothy Nevin, who asserted that he worked in a supervisory capacity with ICE, prepared this declaration "at the request of the U.S. Attorney's Office, and that his representations were only based on his "*review* of Martinez's administrative file, consultation with [his] colleagues, and ICE electronic records and databases." (*See* Dec. of Timothy Nevin, ECF No. 24, at ¶ 2.) Based on this representation, Mr. Nevin's declaration would appear to be hearsay from a removed third party, which at best, only stated in conclusory terms:

> On January 16, 2019, ICE located and arrested Martinez pursuant to a Warrant of Removal/Deportation for the purpose of reinstating his prior order of removal. On that day, a NOIDTR was generated for Martinez and a Deportation Officer subsequently presented that to Martinez and explained the form to him, but Martinez refused to sign and acknowledge it.

The declaration does not explain how Mr. Nevin would know the passive things that he claims happened to Petitioner, beyond that it came from his *review* of the file and *discussions* with his colleagues. In fact, Mr. Nevin describes the form being explained by an omniscient "Deportation Officer." Ironically, on the bottom of this page, where a Deportation Officer is supposed to certify that the officer has properly filled out and served the form, Mr. Nevin's signature appears alongside the date August 27, 1997—the date from 22 years ago when Plaintiff purportedly originally received his removal order. (*See* January 16, 2019 NOIDTR, ECF No. 25-5.) It behooves the Court

that on a form that Petitioner claims he never saw until this Court filing, which contains a host of errors, including certification dates from more than two decades years ago, Mr. Nevin's signature appears, and yet, nowhere in Mr. Nevin's declaration does he assert that he ever signed the form.

As the Court stated, the entire form is filled with dubious discrepancies. Through April, Petitioner's lawyer could not locate any *completed* NOIDTR containing the signature of a Deportation Order that justified reinstatement of Petitioner's 1997 removal order. In fact, counsel produced another incomplete NOIDTR that dated from July 2014. (*See* July 16, 2014 NOIDTR, ECF No. 18-10.) And as the Court previously mentioned, the NOIDTR that the Government recently produced, which has a January 16, 2019 date at the top, has Mr. Nevin's signature at the bottom with a certification dated August 27, 1997. (January 16, 2019 NOIDTR, ECF No. 25-5.) And neither Petitioner nor his Counsel ever report seeing or being served with it.

I have looked over this document and find it facially deficient. It makes no sense that a valid reinstatement of removal order: 1)  has a date that precedes when Petitioner was actually removed, 2) was supposedly signed by a deportation officer who made no representation of signing it (and whose declaration suggests that someone else signed it), 3) was supposedly presented to Petitioner and his Counsel, when both have repeatedly represented that they had no documentation governing Petitioner's removal, and 4) where the Government has not provided any tangible proof that this form existed on January 16, 2019, let alone that a Deportation Officer actually signed it and served it on Petitioner. These are more than minor technicalities. There is virtually no proof that this documented existed and was served when the Government purports that it did, and considerable evidence suggesting just the opposite.

Similar to how the Supreme Court, in *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), held that a notice form that was facially deficient would not satisfy the notice provisions for the stop-time rule (in that case the form's purpose was to give the noncitizen the time and place of removal proceeding, both of which were lacking) here, the NOIDTR was also facially deficient in proving that it existed at the time of Petitioner's detention or was served on him. The document has absurd dates and was only signed by a Government Officer who did not even recall signing the document in his affidavit. Petitioner's signature is nowhere on the document, and ample evidence suggests that Petitioner's counsel never received it.

Accordingly, based on my review of the record, the law, and the presented at the Show Cause Hearing, I conclude that when Petitioner was first arrested and detained, he was not served with any NOIDTR and never received written notice prior to or immediately after his detention.

### b. Constructive Notice is Inadequate Process for Liberty Deprivations

The Government, however, still does not think this fact is detrimental to detaining Petitioner. The Government argues that, even if it did not produce and serve Petitioner with a valid NOIDTR at the onset, Petitioner's original detention was still constitutional because he had constructive notice of why he was being detained, and in any event, no service is required under the new reinstatement provision. (Def. Mem. at 8-9.)

In support of its position, the Government relies heavily on *Garcia-Villeda,* a case in which the Second Circuit recognized that Congress passed the reinstatement provision as an amendment to the IIRIRA to narrow the process requirements and "make the removal of illegal reentrants more expeditious." 531 F.3d at 147. But the Government also concedes that that the *Garcia-Villeda* Court emphasized that Section 241.8(b) was the procedural mechanism to implement this new

18

reinstatement provision. *Id*. at 145. And again, Section 241.8(b), expressly requires written notice. 8 C.F.R. Section 241.8(b) (the immigration officer "*shall* provide the alien with a written notice of his or her determination" and "*shall* advice the alien that he or she may make a written or oral statement contesting the determination.")

Further, the Second Circuit recognized that what the reinstatement provision really eliminated from the previous version of the statute was the right for people subject to reinstatement orders to have a *hearing* before an immigration judge. The Court explained that removing the hearing provision from the previous statute was not unconstitutional because aliens who had received final removal orders already had hearings before immigration judges. *Id*. at 145. With the reinstatement provision, Congress was merely eliminating the *duplication* that arose from requiring a hearing before an immigration judge in *both* removal and reinstatement proceedings.

This Court acknowledges that eliminating the right to hearing can be constitutional, where there is an adequate administrative process in place. This principal was established long ago when the Supreme Court held that the Due Process Clause of the Fifth Amendment can be satisfied without a hearing, so long as there is sufficient written notice and written procedures in place that one can avail before being deprived of life, liberty, or property. *Mathews v. Eldridge*, 424 U.S. 893 (holding that, under Due Process Clause of the Fifth Amendment, an evidentiary hearing is not required for the government to terminate disability benefits because administrative procedures allowing a person with a property interest to contest the termination through *written* notice and grievance procedures comports with constitutional due process requirements). *Dixon v. Blackensee*, No. 17-CV-7359 (NSR), 2019 WL 2433597 (S.D.N.Y. June 11, 2019) (holding that

under the Due Process Clause of the Fifth Amendment, prisoners do not have an unequivocal right to a civil hearing unless it is the only way for them to meaningfully access the Courts).

Thus, the key to the constitutionality of a grave deprivation, of course, is that before the Government unilaterally takes away that which is sacred, it must provide *meaningful* process—as what the Constitution protects is "due process" not the right to a "hearing." *Mathews v. Eldridge*, 424 U.S. at 334 (underscoring the truism that "due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances, …but is flexible and calls for such procedural protections as the particular situation demands."); *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191 (1965) ("The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner."); *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 168, 71 S.Ct. 624, 646 (1951) ("the right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.")

But while the mechanics of due process may be flexible, Congress cannot do away required safeguards through legislation. Time and again, the Supreme Court has reiterated that regardless of what provisions and procedures Congress enacts pursuant to its "plenary power" to create immigration law, that power is always subject to constitutional limitations. *Zadvydas II*, 533 U.S. at 695 (citing *INS v. Chadha*, 462 U.S. 919, 941-42, 103 S.Ct. 2764 (1983) (Congress must choose "a constitutionally permissible means of implementing" that power); *The Chinese Exclusion Case*, 130 U.S. 581, 604, 9 S.Ct. 623 (1889) (holding that congressional authority is always limited "by the Constitution itself and considerations of public policy and justice which control, more or less, the conduct of all civilized nations").

There is no room for doubt. Neither the Executive Branch nor Congress can circumvent the fundamental Constitutional rights of those whom the Constitution protects. *Lopez v. Sessions*, 2018 WL 2932726, at *11 ("All issues with respect to immigration, naturalization, admission, and removal of aliens stem from Congressional action undergirded by constitutional requirements.")

Here, Petitioner was completely deprived of written notice, a fundamental element of due process that Section 241.8(b) cannot, and did not, abrogate with the new reinstatement provision. Written notice is crucial. The Supreme Court has held that the right to be heard "has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Mullane*, 339 U.S. at 314; *Memphis Light*, 436 U.S. at 14 (1978) ("The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing.'").

Here, Petitioner did not have the chance to decide whether to contest his case or how to prepare for a hearing, which is what written notice allows one to do. Instead, he was blindsided and unknowingly deprived of the most sacred things he enjoyed – his liberty.

Under the *Mathews v. Eldridge* procedural due process test, his private interest in personal liberty was of the highest interest one can have, weighing the first prong clearly in his favor. *Younberg v. Romeo*, 457 U.S. 307, 316 (1982) ("Liberty from bodily restraint has always been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action.").

The second prong – risk of erroneous deprivation of that interest – was extremely high because Petitioner was not given the time and ability to strategize how to contest it, which he claims he will still do on the merits, and which is the very purpose of requiring advanced written

notice before a deprivation. But now, Petitioner is attempting to do that from within prison, where his access to his belongings, the courts, and to counsel is severely limited. Therefore, this factor too weighs in favor of finding a procedural due process violation.

And last, the Government's fiscal and administrative burdens were low. The Government had little to lose by providing Petitioner with advanced written notice on completed forms and offering a meaningful opportunity for him to search his papers, solicit counsel, and contest detention. Indeed, because Petitioner was detained, he was unable to attend his first bond hearing at all (which appears to have been lost on an erroneous application of facts and law), and the withdrawal-only hearing was recently adjourned by six more weeks due to faulty technology in the correctional facility. (*See* Letter dated 6/12/19, ECF No. 36). These are the exact irreparable harms that adequate notice and process are designed to avoid.

Petitioner was (and would like to remain) an established member of his community, living with his family of U.S. citizens and a enjoying a vast support network. He has no criminal history, runs a profitable business, and tends to his family's many needs. The Court cannot fathom what the burden the Government actually faced in depriving him of barebones process. Their conduct reeks of arbitrariness and carelessness. That is not to say that the Government does not have a valid interest in investigating aliens whom they suspect of violating immigration laws, and even ultimately deporting some. But for alleged aliens who long-ago entered and have lived for decades within the nation's borders, who have no criminal history, and whose personal stakes are at their zenith, the Government has an obligation to be more meticulous and less intrusive before arbitrarily depriving them of their most valuable interest.

Therefore, I find that even though eliminating an alien's right to a hearing may pass constitutional muster, depriving an alien with substantial ties to the United States of *both* written notice and a hearing *before* detaining him for several months not only violates the IIRIRA's reinstatement order, Section 248.1's implementation provisions, and a host of agency regulations, but it also fundamentally violates the Due Process Clause of the Fifth Amendment because it deprives him of any way to meaningfully contest the basis for his detention.

Accordingly, Petitioner's detention was unconstitutional.

### III.    The Writ Shall Issue

The writ is granted, and Petitioner will be released from Essex County Jail. There are at least two separate reasons warranting this outcome. The first is that the writ application is not moot. It relates back to when Petitioner was first unlawfully detained, and it can be used to equitably redress that unlawful detention, for which there is no other remedy. The second is that Plaintiff's present detention remains unconstitutional, and the writ's most classic function is to release someone who is presently unlawfully detained.

The Court next addresses why the writ is not moot, despite being filed prior to Petitioner being served with facially proper written notice. Next, it will address why it is also appropriate to issue the writ based on Petitioner's current detention, which remains unconstitutional.

### IV.    The Writ Relates Back to When Petitioner was Unlawfully Detained

Defendants argue that issuing the *habeas corpus* writ is inappropriate because Petitioner's initial and present detention were both constitutional. (Def. Mem. at 2.) The thrust of their argument is that because Petitioner's present detention is supposedly proper, there is no cure for Petitioner's prior period of detention, even if it was unlawful.

23

Petitioner argues that it is appropriate for the Court to issue the writ because the operative question in deciding whether to issue the writ is whether the detention was lawful *at the time the petition was filed*. (Pet. Mem. at 2.) The Court agrees with Petitioner.

Petitioner relies on *Carafas v. LaVallee* to support the notion that an unlawful detention is not mooted by being "converted" to a lawful one. (Pet. Mem. at 2-3.) In *Carafas*, the petitioner was criminally convicted and served his full sentence, during which time his *habeas* petition worked its way through various state and federal courts without being resolved on the merits. By the time the Supreme Court granted *certiorari* on the application, Petitioner had already been unconditionally released from custody. The Supreme Court nevertheless held that a remedy was still available via *habeas corpus* because: 1) under the *habeas* statute, once federal jurisdiction attaches in the District Court "it is not defeated by the release of the petitioner prior to completion of proceedings on such application," and 2) because *habeas corpus* was designed to afford flexible forms of equitable relief, it would not be just for the Court to dispose of the matter simply because during the pendency of the litigation, Defendant completed his time. *Id*. at 1560-61 ("He should not be thwarted now and required to bear the consequences of assertedly unlawful conviction simply because the path has been so long that he has served his sentence. The federal habeas corpus statute does not require this result"). The Supreme Court emphasized that it would be fundamentally unjust to have petitioner live with his unresolved petition, the consequences of which he would continue to bear. *Id*.

This Court finds the *Carafas* reasoning compelling. Just as Carafas' release from custody did not moot his application because he was in custody *at the time he filed the petition*, the Court

does not find Petitioner's current status – even if it has been converted to a lawful one – a bar to allowing the Court to exercise an appropriate equitable remedy through the writ.

Further, the Government's reliance on *Walker v. Wainwright* to suggest that *habeas corpus* may only test the legality of a prisoner's current detention misconstrues what *Walker* actually held. In that case, the petitioner had been convicted of two completely separate crimes and filed a writ of *habeas corpus* to challenge the legality of the first crime for which he would independently have to serve a life sentence. 390 U.S. 335, 88 S. Ct. 962 (1968)). The Government argued that the Court need not issue the writ because it would be futile in securing his release based on his second, totally unrelated, conviction.

The Supreme Court rejected the Government's argument, which had swayed the district and circuit courts. Instead, it noted "the extraordinary predicament in which the District Court had placed the petitioner" by denying him the opportunity to challenge his original detention through the writ. The Supreme Court then overruled its own precedent and held that the fact that Petitioner may have to serve a separate sentence for another crime did not serve as a bar to his *habeas* petition because it would be unjust to deny him the chance to challenge the constitutionality of the detention in connection with which he filed his application.

In sum, the Supreme Court has repeatedly upheld prisoners' rights to challenge the constitutionality of their detentions, and allow courts to implement corrective remedies, regardless of whether there were other bases for the petitioners to be subsequently detained, or whether they had already been released. Accordingly, the Court finds that Petitioner's application for *habeas corpus*, which was filed while he was unlawfully detained, is an appropriate basis for the Court to

scrutinize his entire detention. This is particularly so where—as here—the detention appears to be one continuous event derived from one underlying set of facts.

## V. Petitioner's Current Detention is Still Unconstitutional

Petitioner next argues that his detention remains unconstitutional, notwithstanding the seemingly proper NOIDTR that the Government issued on May 13, 2019, because Defendants only produced and served that order by violating a host of Petitioner's Constitutional rights. Therefore, the Court may invalidate or suppress that order, similar to how the exclusionary rule is used to set aside evidence attained through egregious Fourth and Fifth Amendment violations. (*Id.* at 9-10.) The Court agrees.

### a. Agencies Repent for Violating their own Regulations

The Court begins by assessing the consequences of agency violations of their own regulations. In *Montilla v. I.N.S.*, the Second Circuit held that agency acts that violate their own regulations must be set aside, especially when those regulations implicate constitutional or due process concerns, or "where the violated agency regulation governs individual interests." *Montilla v. I.N.S.*, 926 F.2d 162, 170 (2d Cir. 1991). In *Montilla*, the Second Circuit found that where an immigration judge had not properly appraised the alien of his right to have counsel, which was a constitutional right and controlling rule on the agency, the only appropriate remedy was for the district court to *reverse the entire hearing*, "irrespective of whether a new hearing would produce the same result"). S*ee id.* at 167-70. ("As the Supreme Court noted[,] where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required"). *See also Montero v. I.N.S.*, 124 F.3d 381, 386-87 (2d Cir. 1997) ("A removal proceeding should

be terminated where the INS fails to adhere to its own regulation and the regulation was promulgated to protect a fundamental right derived from the Constitution or a federal statute.").

Similarly, in *Zuniga-Perez v. Sessions*, the Second Circuit suppressed evidence that the Government attained to deport aliens, where the government search violated fundamental Fourth Amendment rights by being conducted without: a warrant, consent, or exigent circumstances. 897 F.3d 114 (2d Cir. 2018) (emphasizing that the Constitution protects both citizens and non-citizens from Fourth and Fifth Amendment violations.). Indeed, the Second Circuit has long held that evidence attained by the Government by violating constitutional rights of aliens may be suppressed. In *Rajah v. Mukasey*, the Second Circuit also explained that, in immigration proceedings, suppressing evidence is allowed where there has been an egregious violation of the Fourth or Fifth Amendment that is "fundamentally unfair." 544 F.3d 427, 441 (2d Cir. 2008). There, the Court gave examples of the types unconstitutional violations, for example: "government agents may not stop a person for questioning regarding his citizenship status without a reasonable suspicion of alienage." *Id.* at 441. Similarly, it held that the "Fifth Amendment protects aliens in deportation proceedings from procedures that transgress the *fundamental notions of "fair play"* that animate the Fifth Amendment." *Id.* (emphasis added).

The Court upheld the principle in *Waldron v. I.N.S.*, 926 F.2d 162, 170 (2d Cir. 1991), where the BIA violated a rule requiring a detained alien to contact diplomatic consular authorities. The Court was unwilling to undo the BIA's acts, underscoring that the difference between its decision and the one in *Montilla* was that, in *Montilla*, unlike the instant case, the agency violated a rule directly implicating the alien's fundamental Sixth Amendment right to counsel." *Id.* at 518.

This reasoning also drove the Supreme Court's decision in *United States v. Caceres*, which held that agency violations of mandatory rules derived from the Constitution had to be invalidated. *United States v. Caceres*, 440 U.S. 741, 99 S. Ct. 1465 (1979). The Court explained signatures and oaths, which are designed "to afford the alien due process of law" by providing "safeguards against essentially unfair procedures" qualify as mandatory agency rules and therefore cannot be infringed. *See id*. at 749, 99 S. Ct. 1465 (1979) ("A court's duty to enforce an agency regulation is most evident when compliance with the regulation is mandated by the Constitution or federal law.")

In short, for agency conduct to be invalidated based on an agency's violation of its own regulations, courts focus on whether the violation is tied to a fundamental constitutional interest

### b. DHS Violated its Own Constitutionally-Necessary Regulations

Here, as the Court already discussed, Defendants violated their own regulations, which are tethered to fundamental constitutional rights in multiple ways. First, the Petitioner was given no written notice, as the agency regulations explicitly require, when he was arrested and detained. Thus, he was completely unable to meaningfully challenge the initial basis for his confinement and was deprived of adequate procedural due process.

Second, Petitioner was then detained for four additional months, with no indication that the Government had any intention of curing Petitioner's original constitutional deprivation of baseless confinement. This resulted in a violation of Petitioner's substantive due process rights because he suffered unconstitutional confinement for four months. Indeed, in another recent immigration *habeas* decision from this Court, the late Judge Sweet held that where a non-citizen alien had been deprived of meaningful procedural due process and was therefore confined for 200 days unnecessarily, he was also deprived of his substantive due process rights. *Lopez v. Sessions*,

28

2018 WL 2932726, at *12. Although, here, Petitioner's detention was about half as long as the alien's in *Lopez*, the Show Cause hearing reflected that the Government had no intention to independently cure Petitioner's constitutional infringements, as they only produced written notice on the day that Petitioner filed his Order to Show Cause.

Third, the Government's attempt to provide belated written notice still violated agency regulations and Section 248.1, which together require a host of procedural requirements at the time of detention. Thus, if the Government claims that they properly detained Petitioner when they served him with a new piece of paper, he should have received the full panoply of procedural safeguards that the Second Circuit in *Garcia-Villeda v*, 531 F.3d at 149 discussed:

> First, "[t]he immigration officer must obtain the prior order of ... deportation relating to the alien." *Id.* § 241.8(a)(1). Second, if the alien's identity is disputed, the officer must compare the alien's fingerprints with those of the previously deported alien; "[i]n the absence of fingerprints in a disputed case the alien shall not be removed pursuant to [the reinstatement regulation]." *Id.* § 241.8(a)(2). Third, in making the crucial finding that the alien reentered the U.S. unlawfully, the officer must "consider all relevant evidence, including statements made by the alien and any evidence in the alien's possession." *Id.* § 241.8(a)(3). If the alien claims lawful admission, "the officer shall attempt to verify" the claim by checking the available ICE databases. *Id.* Last, even when the officer finds that the alien is subject to removal, the alien must be notified in writing of this adverse determination and be advised of the right to submit "a written or oral statement contesting the determination," which the officer must then take into account. *Id.* § 241.8(b). "If the alien expresses a fear of returning to the country designated in [the reinstatement] order, the alien shall be immediately referred to an asylum officer for an interview." *Id.* § 241.8(e). The alien may also challenge the reinstatement order in a court of appeals. 8 U.S.C. § 1252(a).

Here, the agency was only able to serve Petitioner because he was *already* in their unlawful custody in violation of his Fifth Amendment procedural and substantive due process rights. Moreover, the Government still ignored the majority of the statute's concomitant procedural

safeguards. For example, Plaintiff was not immediately referred to a new asylum officer for a hearing based on his fear of persecution, and he was not given a new bond hearing. Quite the opposite. Because Petitioner was already detained, he was unable to appear at his first bond hearing and was also disallowed by ICE to travel and appear for his withdrawal-only hearing, resulting in a botched effort to set up the hearing via video conference technology at Essex Correctional Facility and an adjournment of Petitioner's entire hearing for another six weeks due to the dysfunctional technology and backlog. (*See* Letter Dated 6/12/2019, ECF No. 34.)

Therefore, belatedly receiving a piece of paper did nothing to help him meaningfully contest his loss of liberty because it did not give him a practical way to challenge his detention—such as through a hearing or otherwise—which is exactly why these rules exist (and constitutionally must exist). *Memphis Light*, 436 U.S. at 14 ("The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing.''"); *Lopez*, 2018 WL 2932726, at *12 ("The "essence" of procedural due process is that a person risking a serious loss be given notice and an opportunity to be heard in a meaningful manner at a meaningful time.").

Moreover, the loss from his inability to meaningfully contest the hearings he already had without appearing or missed altogether may soon be irreparable. *See Dixon v. Blackensee*, 2019 WL 2433597 ("where a Plaintiff loses access to the Courts, there is often no way to reverse that equitable damage. Doctrines like statutes of limitations and *res judicata* can have finality that bars Plaintiffs from simply re-litigating the issues they attempted to raise. Courts are weary to unravel their own determinations or give Plaintiff's two bites at the apple.").

Accordingly, the Court finds the situation very much akin to the instances in which courts suppressed evidence attained in violation of agency rules connected to Fourth, Fifth, or Sixth Amendment rights. Here, the written notice on which the Government based its entire defense blatantly violated Petitioner's Fifth Amendment rights, both procedural and substantive.

Just as district courts in this Circuit and the Second Circuit have held many times before, Defendants cannot enjoy the poisonous fruits of their unlawful acts. The Court deems the defective May 13, 2019 notice having no legal substance and failing to comply with statutory and constitutional safeguards. Therefore, it finds Petitioners' current detention as unconstitutional and lacking in process as his initial.

With that groundwork laid, the Court may finally address the propriety of using the writ of *habeas corpus* to release Petitioner from custody.

## VI. Granting Immediate Release Through the *Habeas Corpus* Writ is Necessary

Petitioner argues that the appropriate remedy for the Government's string of unconstitutional conduct is for the entire detention to be negated. (Pet. Mem. at 9-10). ("A four month-long detention without issuance or service of any legal process clearly constitutes an egregious violation of Fourth and Fifth Amendment rights. The only effective remedy is to order that Plaintiff be released forthwith…"). Defendants, naturally, disagree. Their position is that because none of the Constitutional violations affected the underlying facts regarding Plaintiff's immigration history and status, he has not shown any cognizable harm, let alone harm that warrants cure through the writ of *habeas corpus*. For the following reasons, the Court agrees with Petitioner.

### a. Petitioner Has Shown Cognizable Harm

The Court begins with the Government's argument that Petitioner cannot seek a remedy for being deprived of due process without alleging "some cognizable prejudice fairly attributable to the challenged process," which he has not done. (Gov. Mem. at 7.) It again relies on *Garcia-Villeda* to essentially argue that if the lack of process would not be outcome-determinative, then there is no cognizable harm for the court to remedy. (*Id.* at 7-8.)

Petitioner, however, points out why the lack of process and procedural safeguards did have a prejudicial effect on Plaintiff and could have been outcome-determinative. Petitioner explains:

> Service of the NOIDTR commences the 30 day period within which to file a petition for review of the reinstated order with the Court of Appeals, 8 U.S.C. §§ 1252(a)(5), (b), or to assert a claimed fear of persecution, which in turn may lead to eligibility for a withholding of removal proceeding or hearing in immigration court. 8 C.F.R. §§ 208.31, 241.8(e). If Defendants had served Plaintiff with a proper notice of reinstatement, and asked him about any fears of return to Mexico, he would have been placed in withholding-only proceedings in Immigration Court in January instead of April, which might well be completed by now and Plaintiff released from any ICE custody. Service obviously also allows the person an opportunity to contest his or her identity, or to dispute the underlying removal order, which Plaintiff fully intends to do in this case.

The Court agrees with Petitioner. First, the Government's reliance on *Garcia-Villeda* again distorts what the case actually held. The discussion about cognizable harm appeared only at the very end of the decision, when the Second Circuit explained why it could not collaterally review and vacate the petitioner's *underlying removal order*, over which it did not have appellate jurisdiction. *Garcia-Villeda*, 531 F.3d at 150. The Second Circuit explained that because Plaintiff had the ability to directly appeal his original deportation proceeding to the BIA, which he had voluntarily foregone, that order became valid final order, for which Congress did not provide a door to collateral review. Thus, Plaintiff's lack of due process—insofar as not having a hearing

pursuant to the new reinstatement amendment—would have no cognizable effect on the Court's inability to review the underlying removal order. *Id.*

That is entirely different from the instant scenario. First, Petitioner has not asked this Court to collaterally review his underlying removal order, and indicates that he is contesting that separately through the proper direct appeals channels. Second, Petitioner's argument is that if he had been served with adequate timely notice and been able to promptly contest the basis for his detention, he may have been released by now and not had to endure continued unlawful incarceration, which itself is an irreparable harm. *United States v. Montalvo-Murillo*, 495 U.S. 711 (1990) ("[I]t is well to remember the magnitude of the injury that pretrial detention inflicts and the departure that it marks from ordinary forms of constitutional governance"); *Dash v. Mitchell*, 356 F. Supp. 1292, 1309 (D. D.C. 1972) ("detention inflicts irreparable injury on persons detained by subjecting them to incarceration without any compensation, even if the detention is subsequently held to have been wrongfully imposed").

Moreover, Supreme Court has already held that individuals suffer ongoing harms from enduring unnecessary periods of detention. *See Carafas*, 391 U.S. at 237 (explaining how false imprisonments can have long-term negative consequences on socio-economic activities such as running businesses and participating in civic duties). Similarly, courts recognize the irreparable harms that stem from being unlawfully separated from family. *See United States v. Wharton*, 514 F.2d 406, 408, 412 (9th Cir. 1975) ("Governmental conduct would work a serious injustice if this family were divested of the home in which they have invested so much of themselves").

And here, based on the letters submitted by Petitioner's family and community members, it is evident that his continued detention will continue to cause them extreme emotional harm and

will jeopardize the livelihoods of members throughout the New Paltz community. (*See e.g.,* Paul O'Dwyern Dec., ECF No. 18-1, Ex. A (letter from daughter reflecting deep remorse); Ex. B (letters from son and another daughter reflecting deep grief, worry, anxiety, and indicating that they are being bullied in school and are frequently missing school); Ex. C (letters from New Paltz Chambers of Commerce, business attorney, design groups, and news articles describing how Petitioners' business projects added hundreds of jobs and tourism to local community, and how Petitioner supported many small business owners and local charities); Ex. E (letters from New Paltz Town Council and Village Board, New Paltz Central School District, St. Joseph's Church, our Lady of Fatima Church, and Family of New Paltz Crisis and Hotline Center, reflecting how many jobs, school events, and community events Petitioner was supporting); Ex. F (letters from friends, neighbors, and local businesses reflecting how many less fortunate communities he was supporting); Ex. G (media articles reflecting his family's suffering and protests on the streets)).

Accordingly, the Court rejects the Government's seemingly baseless argument that Petitioner has not shown cognizable harm from the lack of due process.

### b. Immediate and Unconditional Release is the Warranted

This brings the Court to its last point on this matter—which is at the heart of *habeas corpus* relief—and that is fashioning the appropriate remedy.

Petitioner argues that "a four-month long unlawful detention without issuance of any legal process clearly constitutes a violation of the Fourth and Fifth Amendment rights," and "[t]he only effective remedy is to order that Plaintiff be released forthwith and that he remain released from custody during the pendency of his U visa petition and his withholding-only proceedings." (Pet.

Mem. at 10.) He adds that Defendants may "retain the ability to petition this Court for a change in any order should any of the relevant facts change." (*Id*.) Defendants, of course, object.

The Court agrees with Petitioner. This is a rare instance in which there is no appropriate remedy to fix the egregious violations of Petitioner's fundamental rights other than for the Court to issue his immediate release from custody. The Court notes, again, that because it suppressed the May 13, 2019 reinstatement order, and finds that there really has only been one ongoing unconstitutional detention, *habeas corpus* is already the most appropriate relief for this classic wrong. *I.N.S. v. St. Cyr.,* 533 U.S. 289, 301 (2001) (The great writ of *habeas corpus*, "at its historical core," "has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been at its strongest.")

Separate and apart from the suppression, the Government's conduct has simply been too flagrant and tainted for this Court to allow any of their acts since January 2019 to hold weight. Between the July 2014 defective reinstatement order and the two orders the Government attempted to issue in the last six months, the Government has repeatedly failed in providing Petitioner with adequate written notice and process. It will not be allowed to flout another botched effort, at the risk of again unnecessarily depriving a person, residing within the United States of their liberty.

The writ shall issue. Not only will Petitioner be released from his present custody, but he will remain released, pending the completion of his immigration hearings. *Saravia v. Sessions*, 2017 WL 5569838 (N.D. Cal., Nov. 20, 2017) ("Once a noncitizen has been released, the law prohibits federal agents from re-arresting him merely because he is subject to removal proceedings."); *Lopez v. Sessions*, 2018 WL 2932726, at *32 (same).

Finally, such broad relief is not unprecedented. Similar equitable relief has been provided when liberty interests were infringed in the criminal law context. For example, many years ago, in *Berger v. United States*, the Supreme Court reviewed the case of a criminal defendant who was convicted of being part of a conspiracy. 295 U.S. 78, 55 S. Ct. 629 (1935). On reviewing the conviction record, the Court noticed a host of transgressions taken by the government at trial. *Id.* at 89. ("the United States prosecuting attorney overstepped the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense…"). Based on how tainted the process was, the Supreme Court reversed the entire judgment of the lower courts and ordered a new trial. *Id.* at 82. ("The true inquiry, therefore, is not whether there has been a variance in proof, but whether there has been such variance as to 'affect the substantial rights' of the accused.")

Here too, based on a review of the record and the Show Cause Hearing, the Court finds the Government's impropriety, in arresting and detaining Petitioner, too pervasive for the Court to deem any part of the process proper. Accordingly, as the Supreme Court stated "[i]n these circumstances prejudice to the cause of the accused is so highly probable" that its "cumulative effect … cannot be disregarded as inconsequential." 295 U.S. at 89.

As Petitioner's arrest and detention were blatantly unlawful from the start, the only commensurate and appropriate equitable remedy to even partially restore Plaintiff is to immediate release him and enjoin the Government from further similar transgressions. As Judge Sweet recently emphasized, "ours is a government of laws and not of men," *Lopez*, 2018 WL 2932726, at *1 (citing John Adams, Novanglus Papers, No. 7 (1774)) (issuing similar relief).

The Court agrees. Ours is not one in which a Government may breach with impunity. Ours is not one in which rights may be provided retroactively. Ours is not one in which due process may be glued together from broken pieces and be titled, "A Justice Collage."

No relief short of Petitioner's release will remedy his wrong. The Constitution does not permit the United States Government to target people on the streets, arrest them without serving any papers, deny them meaningful due process, and detain them for arbitrary or indefinite periods of time while they engage in phishing expeditions to justify the arrests. That would turn the Constitution on its head and is precisely why the Fifth Amendment exists. No one is to be deprived of life, liberty or property without due process, lest the innocent suffer.

## CONCLUSION

For the aforementioned reasons, Petitioner's Motion for a Writ of *habeas corpus* is GRANTED. The Government is hereby ORDERED TO RELEASE the Petitioner, Luis Martinez, from the custody of ICE within five days of receiving this order and to show this Court proof of such release on the docket.

The Government is ENJOINED from taking any actions to prevent Petitioner's release from physical custody based on the outcome of the instant action. The Government is further ENJOINED from attempting to detain Petitioner, while the outcome of his immigration proceedings are pending, so long as he is ably cooperating and participating in his proceedings.

Should Plaintiff receive a final order, reflecting that he is being deported immediately, or if any other relevant facts change, parties may petition this Court for a change in this order.

The Clerk of the Court is respectfully directed to terminate this case.

SO ORDERED.

Dated:   June 14, 2019
          White Plains, New York